MARION F. EDWARDS, Judge.
|2In this criminal appeal, defendant/appellant, Jermaine E. Favors (“Favors”), appeals his conviction and sentence on a charge of second degree murder in violation of La. R.S. 14:30.1. For reasons that follow, we affirm both the conviction and the sentence.
Favors was charged with the second degree murder of Jonathan Terhune. Favors entered a plea of not guilty to the charge and was ultimately tried and found guilty as charged by a jury. He was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence, giving credit for time served. Favors filed this appeal.[1]

FACTS

In April of 2007, Jonathan Terhune, the victim, was temporarily staying at friend, Misty Fontenot’s, home located at 2405 Sunny Meade Drive in Harvey, IsLouisiana. On April 30, 2007, at approximately 10:45 p.m., Mr. Terhune went outside to smoke a cigarette and make a call to Jessica Miller, his estranged girlfriend and the mother of his one-year-old son, on his cell phone. As Miss Miller was talking to Mr. Terhune on the phone, she suddenly heard a “guy” say in an aggressive tone, “Drop your pants, and give me your cell phone.” She then heard Mr. Terhune say, “Oh sh*t. Oh, sh*t.”
At that same time, Ms. Fontenot was inside the house rocking her son to sleep when she heard a “pop,” which she thought was a gunshot. She looked out the window and saw Mr. Terhune. She also saw a white sport utility vehicle (SUV) in the street backing up with someone’s foot hanging out of the bottom of the door. There were people inside the vehicle, one of whom was wearing a white T-shirt and had a “twisted” hairstyle and a mask or “something” on his face.
Ms. Fontenot heard Mr. Terhune yelling, “Mama,” which is what he called her mother. She ran outside, went to Mr. Terhune, and picked up his cell phone. Mr. Terhune repeatedly told her that his hip or his leg hurt. She hung up his cell phone and called 911. When the paramedics arrived, she hung up the phone again and called John Roquemore, Mr. Ter-hune’s stepfather, and told him what happened. Mr. Roquemore came to the scene, went inside the ambulance, and saw a bullet hole in Mr. Terhune’s left thigh region. Despite the efforts of the medical personnel in the ambulance, Mr. Terhune died en route to University Hospital.
The initial investigation of the murder did not produce a suspect. Ms. Fontenot went to the detective bureau, after which the detectives took her to the parking lot of a Capital One Bank to possibly identify three individuals they had just stopped in a white SUV. Ms. Fontenot told the detectives that the physical characteristics of those individuals looked similar to the suspects, and she said that that was the vehicle she saw at the scene. However, the detectives thoroughly [ ^investigated those individuals, but the detectives determined that they were not involved in Mr. Ter-hune’s murder, as they had corroborating alibis. The detectives also determined that that vehicle was not involved in the homicide.
About two months later, Ms. Fontenot found an unsigned, handwritten note addressed to the Terhune family on her doorstep. The note stated the cousin of *256 Mr. Terhune’s murderer lived in the Rich-field Apartments, in building 601-610 in the first apartment downstairs as soon as you turn left. The note also indicated that the individual was with his cousin, the murderer, the night Mr. Terhune was killed. Miss Fontenot brought the note to the detective bureau. The ensuing investigation led to the arrest of Favors.
Detective Keith Locascio of the Jefferson Parish Sheriffs Office (JPSO) and others went to the Richfield Apartments and learned that Dominique Hill lived in the apartment referenced in the note. They ultimately located Hill and learned that he and Favors were first cousins. Hill told the detectives that, on the night in question, he was in the rear of a minivan owned by Carl Wilson and that Wilson was driving and Favors was sitting in the passenger seat. Hill also said that Favors exited the vehicle and shot the victim. The detectives arrested Hill, Wilson, and Favors.
Wilson was released when an examination of his truck revealed that it was used in a car washing business and that it had two front seats and a 100-gallon water tank behind those seats, which would not allow someone to sit in the back, contradicting Hill’s story. Wilson also told the detectives that the night Hill was arrested, Favors called Wilson to come and pick him up. Wilson complied. Favors told Wilson that he and Hill were in Wilson’s van and that they went into the Woodmere Subdivision and that Favors shot “the boy in Woodmere.”
| ¡When Wilson and Favors arrived at Wilson’s residence, Wilson’s mother, Pamela Wilson, sensed something was wrong. Favors told her that he was responsible for the male subject being shot in Woodmere and that he was going to have to leave town. Favors also stated that he and Hill were in Wilson’s van at the time, but that (Carl) Wilson was not present, Mrs. Wilson gave the detectives this information. After an investigation, the detectives no longer believed that Carl Wilson was in the vehicle at the time of the shooting, and the district attorney refused charges on him.
In November of 2007, the detectives spoke to Hill again, who admitted that he drove the van, and that (Carl) Wilson was not present at the time Favors shot the victim. Hill said he had lied in his first statement because he was afraid.
The detectives subsequently received information regarding recorded phone calls that Favors had made to Wilson from jail. Detective Locascio applied for and received a court order to obtain those recordings from the Jefferson Parish Correctional Center (JPCC). Those phone calls, which were played for the jury, revealed that Favors was pressuring Wilson to change his story at trial. Wilson contacted Favors’ attorney in order to provide an alibi for Favors; however, Wilson changed his mind and decided not to give a statement to that effect.
Favors’ original attorney, Hilliard Fa-zande, II, testified that Wilson refused to sign an affidavit, not because the affidavit was untrue, but because Wilson was fearful of his life from the actual murderer and because he was afraid the State would prosecute him and his mother for perjury.
Deborah Hill, Dominique Hill’s mother, testified that, when (Dominique) Hill was first arrested in August of 2007, Favors called her. He said, “Tweety, they didn’t have nothing.” When she said the police had her son, Favors told her | ñhe was not going to throw his life away. She said, “What about Dominique’s life?,” but Favors had no response.
Dominique Hill testified that he and Favors are first cousins. On April 30, 2007, the two men were riding in Wilson’s van *257 and smoking marijuana. Hill was driving and Favors was in the front passenger seat. At approximately 10:30 p.m., as they were driving down Sunny Meade in the Woodmere Subdivision, Favors told Hill to pull over. Hill saw a “white guy” standing there and talking on his cell phone, and Hill thought Favors might know the man.
Hill pulled over as Favors requested. Favors exited the van, took a bandanna from around his neck, tied it across his face, and pulled out a gun from his waistline. Favors said, “Give it up. Take off your pants.” When the “guy” did not respond, Favors shot one time, and the “guy” fell on the ground.
Favors got back into the van and told Hill to pull off. Hill testified that he knew Favors owned a gun, but he did not know Favors had the gun on him, nor did he know that Favors was going to rob or shoot the victim when he pulled over. After they left the scene, Hill and Favors went to Hill’s house. When they arrived, Hill went inside and Favors left in the van.[2]
Favors testified at trial. He stated that he was working at Wilson’s business washing cars, and “Charlie” was plastering walls inside the business on the day of the murder. After 7:20 p.m., he and Wilson brought “Charlie” home and went back to Wilson’s business at approximately 8:00 p.m. for three or four hours. Favors contended that he was at Wilson’s shop until approximately midnight on April 30 and was never in Woodmere. He also denied that he shot or tried to rob anyone.
| yFavors denied having twisted hair at the time of the incident, and he asserted that it was not a practice for him to wear bandannas. He claimed that Hill was the individual who shot the victim. Favors further testified that he never owned a handgun.
During the trial, several tapes made by Favors to Wilson from the JPCC were played for the jury. These tapes were the subject of a continuing objection by defense counsel during trial as well as a subject of a pre-trial motion to suppress. The trial judge ultimately denied the motion to suppress the recorded telephone conversations as follows:
I’m going to deny the motion to suppress the statements that were recorded in the jail where the defendant is pre-warned and the recipient is warned, and there’s no expectation of privacy to those tapes. I think that’s been going on in the jail since the jail, you know, has been in existence, those calls are taped. Okay.
With respect to the recorded phone conversations, Carl Wilson testified that Favors contacted him by phone. The tape of the September 22, 2008 phone call was played for the jury. As to that call, Wilson said that Favors seemed to suggest that the reason Favors told Wilson and his mother that he shot the victim was because Favors thought they would not tell anyone. Wilson thought Favors admitted to the shooting in order to help Dominique Hill. Wilson remembered that Favors told him in that conversation, “Stop me from getting life, son ... if you got that power ... why not do it, son?” Wilson said he had the power to help Favors.
The tape of the phone call on April 9, 2009, at 12:53 p.m., was played for the jury. Favors told Wilson the story would be that they were at work on the day of the incident, that they brought Charlie *258 home about 7:15, and then they came back to the shop where they stayed until midnight gutting the inside of the building. Favors also told Wilson that his attorney wanted Wilson to call and let him know if his story was the same as that of Favors. Favors told Wilson during |sthat conversation that the worst that would happen if Wilson came to court and helped him out would be an obstruction of justice charge with a six-month sentence, since that would be Wilson’s first offense. Wilson indicated that conversation took place because Favors was instructing Wilson on what to say to coordinate the stories so Favors could be out of jail on the first.
The tape of the conversation of April 9, 2009, at 8:11 p.m., was played for the jury. Wilson explained that, in that conversation, Favors indicated he was going to have his family and his friends come in to court to intimidate Wilson into not saying anything. Wilson also explained that he was upset because he thought Favors was trying to pressure him about doing something Favors wanted him to do, and Favors did not take his word for it that he would do it. Wilson testified that Favors was his lifelong friend, and he would have done anything he could to help him, even serving jail time for him. Wilson explained there was a part of the conversation where he told Favors he was being selfish by using Wilson’s vehicle during the offense and putting Wilson, his business, and his mother at risk.
The tape of the conversation of April 27, 2009, at 7:47 a.m., was played for the jury. During that conversation, Wilson referred to the prosecutors as “b*tches,” because, by that time, he realized that the phone calls were being recorded, and the prosecutors knew everything that he and Favors were saying to one another about the incident. When Wilson referred to “switching things,” he was talking about switching stories or testimony, and he knew that was not going to work anymore. Wilson remembered part of the conversation in which Favors told him he could plead the Fifth and would not have to testify. Wilson testified that he told the truth to the jury and that Favors, not Hill, shot the victim. Wilson did not change his statement because that would be lying, and he might be charged with perjury.
| ¡¡Favors denied trying to coerce or intimidate Wilson into changing his statement. He claimed he was trying to remind Wilson that he was with him the night of the incident and that Wilson had the power to free him. Favors admitted telling Wilson that, if he was scared, he could plead the Fifth, and he would not have to say anything.

LAW AND ANALYSIS

Favors assigns two errors for our review. In the first, Favors asserts that admission of the recorded phone calls was error because the State did not lay a proper foundation and because the State did not satisfy the requirements of the Electronic Surveillance Act.[3] Specifically, Favors contends that the State did not prove that he was aware that the calls were being recorded. The State responds that the recorded phone calls were properly admitted into evidence at trial.
In a hearing on a motion to suppress, the State shall have the burden of proof in establishing the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.[4] A trial court is afforded great discretion when ruling on a motion *259 to suppress, and its ruling will not be disturbed absent abuse of that discretion.[5] In determining whether the trial court’s ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing but also may consider pertinent evidence presented at trial.[6]
It is well established that both the Fourth Amendment to the United States Constitution and La. Const, art. I, § 5 protect people and their privacy against unreasonable governmental intrusion. However, Fourth Amendment rights must |10be weighed against the governmental and societal interest at stake in maintenance of prisons. The United States Supreme Court has recognized that the limitation of privacy rights of prisoners is acceptable:
A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner’s expectation of privacy always yield to what must be considered the paramount interest in institutional security.... [7]
The Electronic Surveillance Act generally prohibits the interception and disclosure of wire or oral communications.[8] However, there are exceptions to this general prohibition, such as where one of the parties to the communication consents to its interception.[9]
In State v. Durham,[10] cited by both the State and Favors in their briefs, the defense filed a motion to suppress the recordings of telephone conversations made when defendant was incarcerated. The motion to suppress was based upon the assertion that interception of telephone communications was prohibited by the Electronic Surveillance Act, because none of the parties to the conversations affirmatively consented to the interception and recordation. The Second Circuit found that defendant did not exhibit a subjective expectation of privacy in the outgoing calls he made from his jail cell, noting that the parties had stipulated that each call contained a warning that it was subject to being monitored and recorded and that defendant had referred to the lack of privacy in several of the calls.[11]
Favors argues that Durham is distinguishable from the matter before us because here there is no stipulation that each call contained a warning that it was subject to being monitored and recorded and that Favors did not refer to the | ] imonitoring in the taped conversations. While there is no stipulation to that fact, and no talk of being monitored, we are not swayed by Favors’ argument. The Durham court also found that, even if defendant had exhibited a subjective expectation of privacy, which Favors claims he did, it was not one that society was prepared to *260 accept or recognize as reasonable.[12] We find this analysis, given the Supreme Court’s pronouncement of the limited expectation of privacy in prisons, to be persuasive. There was testimony offered by the State that a warning is given to parties to a phone call from JPCC that the call may be monitored. Favors does not dispute that fact.
The Durham court stated that no Louisiana court had interpreted the substance of Louisiana’s Electronic Surveillance Act but that the Act was fashioned after its federal.counterpart, known as the Omnibus Crime Control and Safe Streets Act.[13] The Durham court noted that the Louisiana Act had adopted the two exceptions provided in the federal láw: (1) in the ordinary course of duties of investigative or law enforcement officers,[14] and (2) the consent exception.[15] The Second Circuit recognized that consent may be express or implied from surrounding circumstances indicating that the defendant knowingly agreed to the surveillance.[16] The court stated that defendant knew his calls were subject to being monitored and recorded, and it was common and appropriate for prison officials to condition the use of prison telephones on the prisoner’s agreement that the calls would be monitored and recorded.[17] The court also found it clear that these calls from the jail phone were monitored and recorded in the ordinary course and duties of the parish sheriffs deputies. The Second Circuit concluded that the Louisiana |12Act was sufficiently broad to cover local jail facilities and their officers.[18] We agree.
We find the State has made the requisite showing that Favors’ telephone calls to Wilson were monitored and recorded in the ordinary course and duties of the Jefferson Parish Sheriffs Deputies, thus making this an exception to the Louisiana’s Electronic Surveillance Act. We further find that any expectation of privacy Favors claims relating to the phone calls is not one that society is prepared to accept or recognize as reasonable.
Accordingly, we hold the tapes were properly introduced into evidence, and we find no merit in this assignment of error.
In the second assignment of error, Favors argues the trial court improperly restricted his right to confront a witness against him by restricting the cross-examination of Dominique Hill, a crucial State witness.
At the end of Hill’s testimony, he told the jury that he pled guilty to accessory after the fact to Mr. Terhune’s murder and received a sentence of five-years. Hill also admitted entering a guilty plea to a charge of possession of marijuana with the intent to distribute, for which he received a five-year suspended sentence with a five-year probationary period.
On cross-examination, defense counsel asked Hill when his probation period ended. Hill answered that he still had over three years left on that period. Defense counsel then stated, “You’re still on probation, okay. So you would be subject to probation revocation?” The State objected on the basis that the question called for a legal conclusion. The trial court instructed defense counsel to rephrase the ques *261 tion. Defense counsel then asked, “Do you know what the first thing on your probation form was that you’re not supposed to do?” The State objected to this | iaquestion on the basis that it was outside the course of impeachment testimony. The State argued that defense counsel could only ask when Hill pled, what he pled to, and what sentence he received. When the trial court sustained that objection, defense counsel said, “Okay. Let’s move on[.]”
In his argument on this assignment of error, Favors concedes that only convictions can be used to impeach credibility as a general rule.[19] However, he asserts that defense counsel should have been able to pursue this line of cross-examination because it was for the purpose of exposing Hill’s motivation for testifying. In support of that assertion, Favors argues that case law generally holds that possible or ongoing prosecutions that have not resulted in a conviction can be used to show bias or interest.
The State responds that this issue was not preserved for appeal due to the lack of a contemporaneous objection by the defense. The State further responds that, even if this Court considers the merits of this claim, relief would not be warranted, as the trial judge did not prevent defense counsel from eliciting testimony to support an argument that the potential self-interest of the witness should be considered in weighing his testimony. Finally, the State contends that any error was harmless, as there was overwhelming evidence of Favors’ guilt.
We find that defense counsel failed to contemporaneously object to the trial court’s ruling, and he acquiesced when the trial judge told him to rephrase the question and when she sustained the State’s objection. As such, we find that Favors is precluded from raising this error on appeal.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.[20] There is no “magic-word” formula | unecessary for remarks to constitute an objection.[21] Rather, it is sufficient that a party, at the time of the ruling, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, together with the grounds therefor.[22] Where the defense counsel acquiesces when the court sustains a State’s objection to the examination of a witness, that objection is waived.[23]
For the foregoing reasons, we find no merit in Favors’ assignments of error to this Court. Accordingly, we affirm his conviction and sentence.

AFFIRMED.

. It is noted that Favors’ appeal motion was filed prior to the time he was sentenced. However, the subsequent sentencing cured the jurisdictional defect of prematurity of the appeal motion. See, State v. Smith, 95-734 (La.App. 5 Cir. 1/30/96), 668 So.2d 1260, writ denied, 98-1406 (La. 10/16/98), 726 So.2d 899.

. Hill ultimately pled guilty to accessory after the fact to murder and received a five-year sentence.

. La. R.S. 15:1301, etseq.

. La.C.Cr.P. art. 703(D); State v. Rogers, 09-13 (La.App. 5 Cir. 6/23/09), 19 So.3d 487, 493.

. State v. Lee, 05-2098 (La. 1/16/08), 976 So.2d 109, 122, cert. denied, - U.S. -, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008); State v. Rogers, supra.

. State v. Mollette, 08-138 (La.App. 5 Cir. 11/25/08), 2 So.3d 461, 467, writ denied, 09-155 (La. 10/16/09), 19 So.3d 472.

. Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194 at 3200, 82 L.Ed.2d 393 (1984).

. State v. Esteen, 02-1241 (La.App. 5 Cir. 4/29/03), 846 So.2d 167, 176, writ denied, 03-1486 (La. 1/9/04), 862 So.2d 978.

. La. R.S. 15:1303(C)(3).

. 43,558 (La.App. 2 Cir. 10/15/08), 996 So.2d 642.

. Id. at 648.

. State v. Durham, 996 So.2d at 648.

. 18 U.S.C, § 2510 et seq.

. La. R.S. 15:1302(10)(a)(ii).

. La. R.S. 15:1303(0(3).

. State v. Durham, supra.

. Durham, 996 So.2d at 649.

. Id.

. See, La. C.E. art. 609.1.

. La.C.Cr.P. art. 841(A).

. State v. Shoemaker, 500 So.2d 385, 388 (La.1987).

. La.C.Cr.P. art. 841; State v. Shoemaker, supra.

. State v. Huizar, 414 So.2d 741, 749 (La.1982).