MARION F. EDWARDS, Chief Judge.
12Pefendant/appellant, Ernest Sam (“Sam”), was charged by a bill of information with one count of armed robbery, in violation of La. R.S. 14:64. The bill of information also charged Ronald Cornin and Javonte Dillon with armed robbery and charged Ronald Cornin with aggravated flight in violation of La. R.S. 14:108.1(C). However, this appeal only concerns Sam. Sam was subsequently arraigned and pled not guilty. The State subsequently amended the bill of information to charge Sam under the firearm enhancement penalty provision of La. R.S. 14:64.3, and Sam was re-arraigned on the amended bill.
Sam filed a Motion to Suppress Statement and Physical Evidence, which was *582 denied by the trial court. Sam proceeded to trial, following which a twelve-person jury found him guilty as charged of armed robbery with a firearm. He was sentenced to forty years at hard labor. On the same date, Sam pled guilty to obscenity, in violation of La. R.S. 14:106, and contraband in a correctional center, in violation of La. R.S. 14:402, which occurred on May 22, 2010 and August 26, 2010, respectively. He was sentenced to one year on each charge to run ^concurrently with one another and with his sentence in the present case. The trial court then ordered his sentence enhanced by an additional five years of imprisonment under the firearm enhancement provision of La. R.S. 14:64.3.
On the same date, the State filed a multiple offender bill of information against Sam, alleging that he was a second felony offender. Sam denied the allegations in the multiple bill, and the trial court set a hearing date of November 18, 2010. Sam filed for the present appeal prior to the multiple offender proceedings. Those proceedings are the subject of a companion appeal, State v. Sam, 11-KA-470. In the present case, Sam appeals his conviction.
At trial, the victim, Larissa Ubeira, through an interpreter, testified that, on July 23, 2009, at approximately 5:00 a.m., she was preparing to go to work. She left her apartment and proceeded to get into her Dodge Caliber. At that time, three young men approached her, pointed a gun at her head, and demanded she give them her money. She gave them her wallet, which only contained three dollars. They then demanded her car keys, and she complied. They also took her GPS. They forced her to lay face down in the grass, and they told her they would kill her if she looked at them. She stayed there until she heal'd her car drive away, and she then called the police from her cell phone. The State played the 911 call for the jury. Ms. Ubeira informed the police that the men had stolen her Dodge Caliber, which had a temporary license plate. However, she was unable to identify any of the individuals. She further testified that a gun, later found in the car, did not belong to her.
At approximately 5:00 a.m., Sergeant David Heintz of the Gretna Police Department responded to a dispatch regarding the armed robbery of Ms. Ubeira at her apartment complex located at 901 Gretna Boulevard. As he was en route to the apartment complex, he contacted Deputy Scott Henning of the Jefferson Parish | .¡Sheriffs Office and informed him that they were looking for a red Dodge Caliber with a temporary license plate in the back window. As Sergeant Heintz approached Gretna Boulevard, he observed a red vehicle with a temporary license plate turning left onto Manhattan Boulevard. Sergeant Heintz, Deputy Henning, and other Jefferson Police units pursued the vehicle, which was traveling at an extremely high rate of speed, across the LaPalco Bridge. After Sergeant Heintz crossed the bridge, he saw that the Dodge Caliber had crashed in the U-turn lane in front of Bohn Brothers Toyota. He further observed Deputy Henning in the process of handcuffing one of the suspects, and he saw the two other suspects fleeing the scene. Sergeant Heintz drove behind an abandoned Wal-Mart in pursuit of the suspects. Approximately ten minutes later, Sergeant Heintz witnessed the two suspects being pulled out of the canal located between the Toyota dealership and the abandoned Wal-Mart. The suspects were subsequently transported to the Gretna Police Station in separate vehicles. Sergeant Heintz called for a wrecker to pick up the Dodge and followed it to the police station garage, where it was secured.
*583 Deputy Scott Henning of the Jefferson Parish Sheriffs Office also recounted the events of the morning of July 23, 2009. Deputy Henning testified that he was patrolling the second district in the area around Manhattan and LaPalco that morning when Sergeant Heintz notified him regarding the Dodge Caliber. He subsequently observed a red Dodge Caliber passing him and heading in the opposite direction. He stated that, as the vehicle passed him, he was able to see all three occupants. He then made a U-turn and initiated his lights and siren in an attempt to stop the vehicle. However, the vehicle accelerated and subsequently “crashed into the curb in the neutral ground of LaPalco Boulevard.” The deputy observed the driver and front seat passenger exit the vehicle and run toward the | ^Toyota dealership across the street. However, he was able to apprehend the individual in the backseat. Deputy Hen-ning testified that he found a revolver on the floorboard of the front passenger’s side of the vehicle. He stated that Sergeant Smith, who initially pursued the other two suspects, observed them jump into the canal. Deputy Henning testified that he observed the two suspects as they were being “fished out” of the canal. Once the suspects were taken from the canal, the case was turned over to the Gretna Police Department.
Officer Kelly Landry of the Gretna Police Department testified that he also received a call that morning, at approximately 5:00 a.m., regarding an armed robbery. At that time, he was performing the duties of both a patrol officer and a crime scene technician. Officer Landry proceeded to the apartment complex to meet with the victim, Ms. Ubeira, who advised Officer Landry that three black males had robbed her at gunpoint and had stolen her car. Officer Landry drove Ms. Ubeira to the Gretna Police Station and then proceeded to the scene of the car accident. He photographed the vehicle at the location. Looking inside the vehicle, he observed a revolver on the front seat passenger’s floorboard. Officer Landry also searched one of the suspects at the scene, Ronald Cornin, and recovered a GPS. He then transported Mr. Cornin to the Gretna Police Station, and the vehicle was towed to the police station for processing. The revolver, which was loaded, was collected, and the vehicle was dusted for fingerprints. Officer Landry identified the photos taken including that of the gun found inside.
Officer Landry dusted the vehicle and two compact discs for fingerprints. A partial print was lifted from one of the compact discs, which was subsequently analyzed by a forensic scientist with the Jefferson Parish Sheriffs Office. Officer Landry did not recover any fingerprints from the vehicle. He further stated that, to | Rhis knowledge, neither Sam’s DNA nor his fingerprints were lifted from the gun. He did not know who drove the vehicle or who put the handgun in place.
Andriana Perez, a forensic DNA analyst at the Jefferson Parish Sheriffs Office Regional DNA laboratory, testified that she obtained a partial profile from the swab of the left side of the handle of the revolver. She tested the DNA profile against the profiles of Cornin and Sam and testified that, due to the limited amount of DNA recovered from the evidence sample, “I was unable to make a conclusion regarding inclusion or exclusion of both Ronald Cor-nin and Ernest Sam.” She could not identify the DNA found on the weapon.
Detective Louis Alvarez, of the Criminal Investigation Division of the Gretna Police Department, was notified of the armed robbery at approximately 6:30 a.m. and “was called to assist with taking the state *584 ments from the suspects in custody.” He testified that he interviewed all three suspects: Sam, Cornin, and Dillon. He stated that the investigation revealed that Cornin drove the victim’s vehicle, while Sam sat in the front passenger seat, and Dillon sat in the backseat.
Detective Alvarez testified that he reviewed the Rights of Arrestee Form with Sam, advised Sam of his constitutional rights, and Sam affixed his initials next to each right on the form. He stated Sam acknowledged that he understood his constitutional rights and signed the form. The detective explained to him that, by waiving his rights, he could give a statement, but, at any time, Sam had a right to ask for an attorney and “everything stops.” Sam then agreed to waive his rights and give a statement. Detective Alvarez testified that Sam was cooperative. Detective Avarez and Detective Snow took Sam’s taped statement, which was subsequently transcribed. The State played the taped statement for the jury.
In the statement, Sam admitted that, when they approached the victim, he had his hand on the gun, variously claiming he pointed it at her, and also that he 17had his hand on the gun in his pants — “Snow: And she sees you with the gun. Sam: I assume she had to.” The two others approached Ms. Ubeira, who relinquished her keys, and they took her vehicle. They were pursued by the police, resulting in the car accident. The statement does not reference the Rights of Arestee Form or that Sam agreed to waive his rights.
On cross-examination, Detective Ava-rez, testified that Sam never asked for a lawyer or requested anything to eat or drink. Defense counsel then asked, “Did you or anyone else affiliated with the Gret-na Police Department strike or coerce him to plead or to speak?” Detective Avarez responded, “I did not.”
Sam testified at trial that his statement was not given freely and voluntarily. He stated that Detective Avarez and another detective hit him, forcing him to make a statement. When he met with Detective Avarez, at approximately 8:00 a.m., Detective Avarez beat him and told him what to say. Sam testified that Detective Avarez “slapped [him] once in the face, and ... hit [him] about four times in [his] side ribcage” with his fist. The prosecutor asked, “Did he hit you hard?” to which Sam replied, “A little bit.” Sam stated that Detective Avarez said, “Tell me that you had the gun. Tell me.” Sam testified that Detective Avarez told him what to say and then later advised him of his rights. Contrary to Detective Avarez’s testimony, Sam stated that he requested an attorney four times. He further testified that he saw a nurse at the Jefferson Parish Correctional Center. When the prosecutor asked Sam if he informed the nurse that he had been beaten, he stated, “No, sir. I just told them I just had hit my head on the car dashboard.”
Sam also testified regarding the day of the robbery. He admitted being with Cor-nin and Dillon when the victim was robbed, but he stated he was unaware they were going to rob anyone. Sam testified that he did not know that Cornin was in possession of a gun before the robbery occurred. He stated that he was just | ¿‘tagging along” when Cornin approached the victim and demanded her car keys. He stated it was Cornin’s idea to rob the victim, and he only told the police that it was a joint effort because they all had been caught together. He further testified that, after the car accident, he exited the car, ran toward the Toyota dealership, and then jumped in the canal. Prior to the suppression hearing, Sam explained the coercion to his lawyer but such was not brought up at the trial of that motion.
*585 Ronald Cornin testified for the defense. He admitted taking the victim’s keys and navigation system and driving the victim’s car. However, he denied having a gun and stated that no one did. Sam did not do anything. Cornin testified that he was unsure when he first saw Sam that morning, and he stated that he did not know where Sam was when the robbery occurred. He further testified that Sam was not in the car with him when he fled the scene, and he was by himself when the police caught him in the canal. Cornin stated that he and Sam were beaten by the police into giving their respective statements and continued to deny that a gun was ever pulled.
On appeal, Sam urges that the motion to suppress should have been granted, and the State should have been prohibited from using Sam’s statement during the trial. He contends that the officers in this case abused Sam’s constitutional rights by beating, intimidating, and threatening him until he surrendered and gave a statement that memorialized his guilt, and the jury’s verdict was based on inadmissible evidence. He avers that his statement was the only evidence to link him to this crime.
At trial, the defense objected to admission of the transcribed statement and to the taped statement solely on the basis of cumulation and contended that the testimony of Detective Alvarez should have sufficed.
| aA defendant bears the burden of asserting the basis for his motion to suppress in order to give the State adequate notice so that it may present evidence and address the issue.[1] After defendant files a motion to suppress, the State has the burden to prove defendant’s confession was of a free and voluntary nature.[2] On appeal, the defendant is limited to the grounds he articulated at trial and a new basis for the claim, even if it would be meritorious, cannot be raised for the first time on appeal.[3]
In the present case, defense counsel filed several pre-trial motions, including a Motion to Suppress the Statement, in which Sam claimed that his constitutional rights were violated because his statement was illegally and unlawfully obtained. At the suppression hearing, defense counsel sought to suppress Sam’s statement, as well as to suppress evidence regarding the buccal swab taken from him. Defense counsel questioned Detective Alvarez regarding Sam’s Rights of Arrestee Form. Detective Alvarez admitted that the Rights of Arrestee Form did not indicate that Sam signed the document before he gave his statement.
Defense counsel did not present any witnesses or offer any evidence at the sup *586 pression hearing. He argued that there was no indication as to what time Sam signed the Rights of Arrestee form, and, therefore, it was unclear if Sam was notified of his rights and waived his rights prior to making his statement. Defense counsel further argued that the transcribed statement did not reflect that Sam was properly Mirandized. He argued that, in the transcribed statement, Detective Alvarez did not ask, “Did I read you your rights ... Did you understand those | mrights?” Rather, the statement began with Sam describing what occurred on the date of the incident. Defense counsel argued that, since it is unclear whether Sam was properly Mirandized, the statement should be suppressed. Thereafter, the trial court denied Sam’s motion to suppress the statement and evidence, and defense counsel noted his objection for the record.
In the present case, Sam failed to present any evidence or argument at the motion to suppress hearing regarding the specific grounds for suppression that he now argues on appeal, particularly the abusive conditions he argues in brief. As previously stated, the only objection at trial on the admission of the statement was on the grounds that it was cumulative. Thus, the issue argued on appeal is not properly before this Court.
Nevertheless, we note the trial court’s decision to deny a motion to suppress is afforded great weight and will not be set aside unless the preponderance of the evidence clearly favors suppression.[4] A trial court is afforded great discretion when ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion.[5] In determining whether the trial court’s ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at the motion to suppress hearing but also may consider pertinent evidence presented at trial.[6]
Before an inculpatory statement made during a custodial interrogation may be introduced into evidence, the State must prove beyond a reasonable doubt that the defendant was first advised of his Miranda[7] rights, that he voluntarily and | ^intelligently waived his Miranda rights, and that the statement was made freely and voluntarily and not under the influence of fear, intimidation, menaces, threats, inducement, or promises.[8] A statement obtained from the defendant by direct or implied promises, or by the exertion of improper influence must be considered involuntary and, therefore, inadmissible.[9] Whether a defendant’s purported waiver of Miranda rights was voluntary is *587 determined by the totality of the circumstances.[10] The critical factor in a knowing and intelligent waiver is whether the defendant was able to understand the rights explained to him and voluntarily gave the statement.[11] Testimony of the interviewing police officer alone may be sufficient proof that a defendant’s statements were freely and voluntarily given.[12]
At the suppression hearing, Detective Louis Alvarez testified for the State. He stated that he advised Sam of his rights by reviewing the Rights of Arrestee Form with him prior to taking his statement. According to the detective, he went over each and every one of the rights, and stated, “If [defendant] understood his rights, I told him to go ahead and initial by each Roman numeral.” He testified that Sam acknowledged that he understood his rights. Sam then waived his rights and agreed to give a taped statement. Detective Alvarez testified that Sam never asked for an attorney and further stated that he did not force, coerce, threaten, or offer Sam anything of value to obtain his statement. Sam also was informed of, and consented to, a buccal swab. Detective Alvarez’s trial testimony was essentially the same. Further, on rebuttal following the testimony of Sam and Cornin, Detective Alvarez testified that he did not abuse Sam when he took his [^statement. The prosecutor asked, “Did you ever punch [defendant] in the ribs? ... Did you ever slap him in the face?” He responded, “No, sir.” The prosecutor then asked, “Did he give this statement freely and voluntarily?” Detective Alvarez replied, ‘Tes, sir.”
The State’s evidence in the record shows that Sam made a knowing and intelligent waiver of his right to remain silent. He initialed next to each of his rights and signed the Rights of Arrestee Form, indicating that he understood what had been read to him and that he wished to waive his rights and make a statement. Detective Alvarez testified that Sam was not coerced or threatened into making the statement. Because Sam did not invoke his right to remain silent, and because he made a valid waiver, we find that the trial court did not abuse its discretion in denying Sam’s motion to suppress.[13]
We note further that the jury had the benefit of hearing the testimony of both Sam and Cornin with regard to the alleged coercion by the officers prior to the statement. It is the jury’s province to give whatever weight it chooses to such evidence, and it is not our function to reweigh evidence on appeal.
This assignment of error is without merit.
We have reviewed the record for errors patent and find none. For the foregoing reasons, the conviction is affirmed.

AFFIRMED

. State v. Cambrice, 10-26, p. 18 (La.App. 5 Cir. 4/26/11), 64 So.3d 363, 375 (citing State v. Jackson, 04-1388, p. 5 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 911, writ denied, 05-1740 (La.2/10/06), 924 So.2d 162 (citing La. C.Cr.P. art. 703(E); State v. Smith, 94-120, p. 4 (La.App. 5 Cir. 5/31/94), 638 So.2d 452, 455)).

. Cambrice, supra (citing Jackson, supra (citing La. C.Cr.P. art. 703(D)); See also, State v. Favors, 09-1034, p. 9 (La.App. 5 Cir. 6/29/10), 43 So.3d 253, 258, writ denied, 10-1761 (La.2/4/11), 57 So.3d 309; State v. Rogers, 09-13 (La.App. 5 Cir. 6/23/09), 19 So.3d 487, 493, writ denied, 09-1688 (La.4/9/10), 31 So.3d 382).

. Cambrice, supra; State v. Torregano, 03-1335, p. 3 (La.App. 5 Cir. 5/11/04), 875 So.2d 842, 845; State v. Richardson, 00-1551, p. 6 (La.App. 5 Cir. 8/28/01), 795 So.2d 477, 482, writ denied, 01-2670 (La.8/30/02), 823 So.2d 939; See also, State v. Merritt, 04-204, p. 6 (La.App. 5 Cir. 6/29/04), 877 So.2d 1079, 1082, writ denied, 04-1849 (La. 11/24/04), 888 So.2d 228.

. State v. Smith, 07-815 (La.App. 5 Cir. 3/11/08), 982 So.2d 821, writ denied, 08-927 (La. 11/14/08), 996 So.2d 1088; State v. Bergman, 04-435 (La.App. 5 Cir. 10/12/04), 887 So.2d 127.

. Favors, supra; State v. Nicholas, 06-903, p. 6 (La.App. 5 Cir. 4/24/07), 958 So.2d 682, 686.

. Favors, 43 So.3d at 259 (citing State v. Mollette, 08-138 (La.App. 5 Cir. 11/25/08), 2 So.3d 461, 467, writ denied, 09-155 (La. 10/16/09), 19 So.3d 472); State v. Loeb, 09-341, p. 12 (La.App. 5 Cir. 2/23/10), 34 So.3d 917, 925, writ denied, 10-681 (La. 10/15/10), 45 So.3d 1110.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Loeb, supra (citing La. R.S. 15:451; State v. Franklin, 03-287, p. 4 (La.App. 5 Cir. 9/16/03), 858 So.2d 68, 70, writ denied, 03-3062 (La.3/12/04), 869 So.2d 817); State v. Blank, 04-0204, pp. 9-10 (La.4/11/07), 955 So.2d 90, 103, cert. denied, 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007).

. State v. Batiste, 06-824, p. 10 (La.App. 5 Cir. 3/13/07), 956 So.2d 626, 634, writ denied, 07-892 (La. 1/25/08), 973 So.2d 751.

. Loeb, supra.

. Id.

. State v. Mackens, 35,350, p. 13 (La.App. 2 Cir. 12/28/01), 803 So.2d 454, 463, writ denied, 02-0413 (La. 1/24/03), 836 So.2d 37.

. See, State v. Cambrice, supra.