**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**22-158**

**STATE OF LOUISIANA**

**VERSUS**

**LARRY CHARLES HARGROVE**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 351,285
HONORABLE GREG BEARD, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR
JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Van H. Kyzar, and Candyce G. Perret, Judges.

**AFFIRMED.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Larry Charles Hargrove**

**J. Phillip Terrell, Jr.**
**District Attorney**
**Catherine L. Davidson**
**Assistant District Attorney**
**Ninth Judicial District**
**P. O. Box 7358**
**Alexandria, La 71306-7358**
**(318) 473-6650**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**KYZAR, Judge.**

The defendant, Larry Charles Hargrove, appeals his conviction for the offense of possession of heroin, for which he was sentenced to serve a term of imprisonment of five years at hard labor. He specifically challenges the denial of a pre-trial motion to suppress evidence and the trial court's ruling sustaining the State's objection to a line of questioning during the cross examination of the arresting officer. For the reasons herein, we affirm the conviction and sentence imposed.

## FACTS AND PROCEDURAL HISTORY

Defendant was charged by bill of information, filed on February 8, 2021, with possession of a controlled dangerous substance, Schedule I, heroin, between two and twenty-eight grams, in violation of La.R.S. 40:966(C)(4)(b). Following an October 27, 2021 jury trial, Defendant was found guilty of one count of possession of a Schedule I controlled dangerous substance. He was later sentenced to serve five years at hard labor.

The basic facts leading to the arrest and conviction of Defendant are not complex. On the night of February 8, 2021, Officer Brian Frost of the Alexandria Police Department (APD), responded to a disturbance call and possible burglary in progress at 1812 Day Street.[1] As he turned his patrol unit onto Day Street, he heard a single gunshot from what he perceived to be a handgun. At that point, Officer Frost alerted the dispatcher regarding the gunshot and proceeded to 1812 Day Street, where he heard the shot fired. As he slowly approached the residence, he testified that he "observed two subjects come from the side of the residence, look out," and

---

[1] At the hearing on the motion to suppress, the parties stipulated to the introduction of Officer Frost's written report in lieu of his live testimony. Officer Frost's testimony during the jury trial was consistent with the information contained in his written report. "In determining whether the trial court's ruling on a motion to suppress is correct, an appellate court is not limited to the evidence presented at a motion to suppress hearing, but also may consider pertinent evidence presented at trial." *State v. Sam*, 11-469, p. 10 (La.App. 5 Cir. 2/14/12), 88 So.3d 580, 586, *writ denied*, 12-631 (La. 9/12/12), 98 So.3d 301.

take off running towards the corner of Orchard Street and Rapides Avenue. In a call to the dispatcher, Officer Frost described the suspects as two black males, approximately six feet tall and weighing between 150-180 pounds, with medium length hair and wearing dark shirts and pants. He stated that the suspects were running from the area. At some point Officer Frost later learned the names of the suspects and relayed that information over the police radio.

Officer Frost testified Corporal (Cpl.) Silton Innerarity, who was on duty in another patrol unit for APD, had the description from the radio, and Cpl. Innerarity started triangulating the area by turning nearby corners and searching for the suspects. Officer Frost testified that to run a person's information through the reporting system, he would need a first and last name and a date of birth. Officer Frost said that entering only a first name would be difficult for him to do anything with unless it was a nickname or moniker.

Cpl. Innerarity testified at both the trial and the hearing on the motion to suppress and detailed his response to the incident.[2] While searching for the suspects, he overheard on the radio Officer Frost's description of and at one point a name of at least one of the suspects. Within ten to fifteen minutes of receiving that information, Cpl. Innerarity noticed someone off to his right as he neared the end of Cottage Street. The subject, who was later determined to be Defendant, took off running. Cpl. Innerarity, after circling around, eventually located Defendant at 19 Ball Powell Street, where Defendant was sitting in front of the residence, near a small fire.

When Cpl. Innerarity approached him, Defendant was very uncooperative, refusing to give his full name, but eventually admitting that his first name was Larry.

_____

[2] Cpl. Innerarity testified in person at the hearing on the motion to suppress and at trial. He testified similarly in both hearings.

2

Cpl. Innerarity testified that Defendant, who was sweating, fit the description given by Officer Frost as to the suspects' physical characteristics and clothing. Based on Defendant's failure to identify himself many times during the course of the encounter, Cpl. Innerarity determined that he had probable cause to arrest him for resisting an officer. He further performed search of Defendant's person for officer safety based on the fact that Defendant had come from the area where shots were fired, he fit the description of the suspects involved in that incident, and he continued to resist Cpl. Innerarity's request for identification. During the search, Cpl. Innerarity found a knife in Defendant's pocket, but no gun, as well as narcotics in his wallet, which was later determined to be heroin. Cpl. Innerarity ultimately placed Defendant under arrest for possession of narcotics but advised Defendant that he was not arresting him for resisting an officer.

On September 15, 2021, Defendant filed a motion to suppress the evidence of the drugs found in his wallet during the search by Cpl. Innerarity. During the October 25, 2021 hearing, the State introduced, in addition to testimony from Cpl. Innerarity, Officer Frost's report, APD's incident report, and a map marked by Cpl. Innerarity. Defendant introduced Cpl. Innerarity's bodycam and dashcam footage.

Cpl. Innerarity's bodycam video reflected the following actions. At approximately thirty seconds into the video, Cpl. Innerarity made contact with a juvenile suspect. During the suppression hearing and the trial, he testified that he believed that the juvenile did not fit with the description given by Officer Frost, as Innerarity had previously observed the juvenile earlier in the day, so he let him move on. At one minute and ten seconds, a voice is heard over the police radio saying that one of the suspects was named "Brandon Eli." During the first five minutes of the video, Cpl. Innerarity was heard accelerating his vehicle and then turning the steering wheel sharply. At approximately six minutes, he was seen exiting his patrol

3

unit and approaching Defendant. At six minutes and ten seconds, Cpl. Innerarity said, "Hey, come see[,]" and told Defendant several times to approach. At six minutes and nineteen seconds, Defendant was seen sitting in a chair next to something smoking and burning in a bucket. Defendant was wearing dark clothing and a hooded, dark jacket with white stripes on the sleeves, with the hoodie on. At six minutes and twenty-one seconds, Cpl. Innerarity asked, "What's your name, my man?" He asked two more times, and Defendant responded, "What'd I do?" Cpl. Innerarity again asked, "What is your name?" Defendant responded, "I'm asking what I done before you question me, cuz [sic] I just got right here." Cpl. Innerarity then said, "I know, you just took off right there whenever I got right there. Stand up for me." Defendant responded, "I ain't running from nowhere." Cpl. Innerarity told Defendant to stand up, and Defendant responded, "I been right here. Man go up and ask them. I ain't come running from nowhere." By this time, another officer arrived on the scene and told Defendant to put his hands up.

At approximately six minutes and forty-seven seconds into the video, Cpl. Innerarity placed handcuffs on Defendant, who began raising his voice and saying that he had been right there. The other officer asked Defendant if he had an ID on him, but Defendant ignored the question and continued talking. Cpl. Innerarity said something along the lines of, "You say you've been here all day but I just saw you running." At seven minutes, Cpl. Innerarity asked Defendant twice what his name was, and Defendant responded, "man, bro." Cpl. Innerarity again asked Defendant for his name. Defendant ignored the question and said the police were arresting him for no reason. At seven minutes and sixteen seconds, the officers asked nearby bystanders for Defendant's name. Defendant continued to yell and curse and insist that he had been sitting there.

4

At approximately seven minutes and forty seconds into the video, the officers escorted Defendant towards the police unit. Cpl. Innerarity told Defendant to "hang tight until we're done." Defendant replied, "Look bro, you can go ride around. Why do you have to fuck with me though? What I did? You ain't got to fuck with me. I've been right here."[3] At eight minutes and twenty seconds, Cpl. Innerarity said, "All I need is your name. That's all I need." Defendant replied, "Bro it's just the fact if I know I ain't do[ne] nothing bro, you really ain't got the right to do this." Defendant continued to curse and say that the police officers did not have the right to do this. Cpl. Innerarity states, "Then give me your name." At eight minutes and forty-one seconds, Defendant said, "My name is Larry bro. I gave you my name. I shouldn't have to give you nothing but Larry because of the fact that I ain't do[ne] nothing." In response, Cpl. Innerarity asked, "Larry what?" A bystander was overheard saying something about hiding, and Defendant said he was not hiding anything. Cpl. Innerarity then stated, "Give me your real name Larry. All I need is your real name."

Defendant continued to yell that the cops were "fucking" with him, and Cpl. Innerarity responded that they were working a shooting. At that point, a bystander began yelling for Defendant to tell the officers his name, and Defendant yelled back at the bystanders around the police unit. At nine minutes and thirty-seven seconds, Cpl. Innerarity patted down Defendant and placed items on the hood of the patrol unit. At nine minutes and fifty seconds, a bystander yelled at Defendant to tell the truth and to tell the officer his name. Defendant said, "Man you're tripping, I'm not doing nothing wrong." Defendant said, "I ain't got no reason to play with you, sir." Cpl. Innerarity responded, "Well you ain't been giving me no information, Larry."

---

[3] The record is quoted verbatim for completeness as to the dialog.

At ten minutes and thirty-six seconds, Cpl. Innerarity stated, "Well no wonder, Larry. . . . How much crack you got in there?" Defendant replied, "I ain't got shit. My ID is the only thing I had in there." Defendant claimed that he had not been wearing the jacket all day and had just put it on.

At eleven minutes and fourteen seconds into the video, Cpl. Innerarity began reading Defendant his rights. Defendant interjected that he was homeless and had nothing on him. At eleven minutes and fifty seconds, Cpl. Innerarity patted down Defendant's legs and shoulders. Defendant continued talking back to the bystanders and said the cops were messing with him. At twelve minutes and thirty-five seconds, Defendant was placed in the back of the patrol unit. At thirteen minutes and four seconds, Cpl. Innerarity approached the other officer and stated Defendant was not telling him anything.

At thirteen minutes and ten seconds into the video, Cpl. Innerarity showed the other officer the drugs found in Defendant's wallet and pulled out two baggies of what he called "meth and powdered cocaine," along with Defendant's license. Cpl. Innerarity then pulled out a case envelope and placed the baggies and the pills into the envelope and stated there was paraphernalia, a scale, a knife, and Taco Bell seasoning. At fifteen minutes and eight seconds, Cpl. Innerarity told the other officer that Defendant took off running but then stopped and sat down, and he also stated that Defendant fit the description of the suspects.

After Cpl. Innerarity entered the patrol vehicle and tried to calm Defendant down, he read Defendant his *Miranda* rights, after which Defendant continued speaking. Cpl. Innerarity asked Defendant why he refused to give his name, and Defendant responded, "Because you were looking for them and you grabbed me. If I tell you they run down the road, why do I got to lie to you about?" Defendant repeated that he was homeless and that he was wearing clothing that had been given

6

to him. He stated, "What I got to sell dope for?" Cpl. Innerarity replied, "I didn't say nothing about selling dope." This last exchange occurs just before the video's nineteen-minute mark, which was the stopping point of the video at both the suppression hearing and the trial.

At the close of the hearing on the motion to suppress, the trial court orally denied the motion, as follows:

> The Court finds that the officer had reasonable suspicion to approach the defendant, reasonable suspicion to frisk the defendant. Based upon the defendant's actions of resisting, [Cpl. Innerarity] had probable cause to arrest him at that point. Search incident to arrest revealed contraband of the narcotics that the defendant was eventually arrested upon. The Motion to Suppress will be denied.

The matter proceeded to a jury trial on October 27, 2021. In addition to testimony of Cpl. Innerarity and Officer Frost, the State also called Carly Desselles, a forensic chemist with the North Louisiana Crime Lab. Ms. Desselles testified that she performed color and gas chromatograph mass spectrometer testing on the two substances seized from Defendant. She identified one of the substances as being 23.841 grams of heroin, Schedule I, but stated that the other substance was not a controlled substance.

After the State rested its case, Defendant opted not to introduce any additional evidence other than to recall Cpl. Innerarity for further questioning. Following its deliberations, the jury found Defendant guilty of the charged offense. Defendant, subsequently, moved for a post-verdict judgment of acquittal, which the trial court denied. Thereafter, the trial court sentenced Defendant to five years at hard labor. Defendant appeals from this judgment.

On appeal, Defendant asserts two assignments of error:

1. The trial court erred in denying the motion to suppress evidence because the officer's detention of Larry Hargrove was not based on reasonable suspicion.

7

2. The trial court abused its discretion in preventing the defense to attack [sic] the credibility of the arresting officer. Larry Hargrove was convicted of possession of narcotics. The only "witness" to the possession was the arresting officer. Thus, his credibility in claiming the drugs were in Larry's possession was crucial for the jury to determine whether Larry "knowingly and intentionally" possessed the drugs.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

## OPINION

### *Assignment of Error Number One*

In his first assignment of error, Defendant asserts that the trial court erred in denying the motion to suppress evidence of the drugs seized because Cpl. Innerarity's detention of him was not based on reasonable suspicion. He argues that Cpl. Innerarity did not have sufficient reasonable suspicion to stop and detain him based on the general description of the suspects in the shooting incident. Based on the facts presented, we disagree.

The Fourth Amendment to the United States Constitution and Article 1, Section 5 of the Louisiana Constitution protect individuals from unreasonable searches and seizures. Although, generally, a constitutionally permissible search requires a search warrant, several exceptions to the warrant requirement have developed over time. *State v. LaRue*, 368 So.2d 1048 (La.1979). An adversely affected defendant "may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained." La.Code Crim.P. art. 703(A). Even though the burden of proof usually rests with the defendant "to prove the ground of his motion," the State bears "the burden of proving the admissibility . . . of any evidence seized without a warrant." La.Code Crim.P. art. 703(D).

8

Appellate courts review "trial court rulings under a deferential standard with regard to factual and other trial determinations, while legal findings are subject to a *de novo* standard of review." *State v. Hunt*, 09-1589, p. 6 (La. 12/1/09), 25 So.3d 746, 751. "A trial court's decision relative to the suppression of evidence is afforded great weight and will not be set aside unless there is an abuse of that discretion." *Id.* at 752.

In denying Defendant's motion to suppress, the trial court gave the following oral reasons for its decision:

> The Motion to Suppress before the Court and agreed [sic] that this is a warrantless arrest, therefore, the burden falls upon the State to prove that there is an exception to the warrantless search and seizure. First off, as Mr. Stephens states, Article 215.1 of the Code of Criminal Procedure basically codifies the Terry v. Ohio case law, provides that in a public place a law enforcement officer may stop a person whom he . . . reasonably suspects is committing, has committed, or is about to commit a crime. A frisk may be conducted if the officer reasonably suspects that he is in danger. A search for weapons may then be conducted if the officer reasonably suspects that the suspect is armed. To stop a person, reasonable suspicion of criminal activity is required. Reasonable suspicion of criminal activity is required to detain. Reasonable suspicion of danger is required to frisk. Reasonable suspicion that the detainee is armed is required for the search of weapon [sic]. Probable cause is required to arrest and then the search for contraband. In this matter the officer has testified call was sent out shots fired in a certain location. Two black males, black clothing were [sic] the description given. Officer was searching the area for any suspects. One was named by the original officer, the other one was not. Officer Innerarity come [sic] upon the defendant in this matter, approached him to question him. The defendant refused to comply by giving his name. Failing to comply . . . creates the reasonable suspicion of criminal activity. The defendant continued to refuse to give his name, the officer detained him. Continued not to give his name but only the first name, of which first names do not constitute names. By not cooperating with him, officer alleges that resisting an officer, he had probable cause at that time. Resisting an officer is the intentional interference with, opposition or resistance to, obstruction of individual acting in his official capacity, which Officer Innerarity was officer in his official capacity, authorized to make a lawful arrest, a lawful detention, or seizure of property. Lawful detention at this time because the investigation fitting the description of two individuals. The officer believed that one of those individuals was the defendant at this time. However, . . . in order to determine that, had to make inquiry of who he is and what he was doing. Also resisting an officer when the offender

9

knows or has reason to know that the person arresting, detaining, or seizing property is an officer. At that time there was probable cause to determine that the defendant was resisting an officer, led to probable cause of making an arrest. Even though the officer did not make the arrest for resisting an officer, he still had probable cause to make that arrest. When you have probable cause to make the arrest, then that is an exception to a warrantless search, search incident to an arrest, which allowed the officer to proceed for a pat-down of any kind of weapons and/or contraband. Contraband was later determined to be found in his wallet where the officer was trying to secure the identification of the defendant. The Court finds that the officer had reasonable suspicion to approach the defendant, reasonable suspicion to frisk the defendant. Based upon the defendant's actions of resisting, had probable cause to arrest him at that point. Search incident to arrest revealed contraband of the narcotics that the defendant was eventually arrested upon. The Motion to Suppress will be denied.

Without question, the search in the instant case occurred without a warrant, and thus, the State bore the burden of proof that an exception to the warrant requirement was present. The trial court determined that the search was authorized as a search incident to arrest. We agree.

Louisiana Code of Criminal Procedure Article 215.1 provides in part as follows:

> A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
>
> B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
>
> C. If the law enforcement officer finds a dangerous weapon, he may take and keep it until the completion of the questioning, at which time he shall either return it, if lawfully possessed, or arrest such person.

"Warrantless searches incidental to arrest are reasonable because when an arrest is made, it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then in his possession." *State v. Sherman*, 05-779, p. 14 (La. 4/4/06), 931 So.2d 286, 295

10

(citing *Cupp v. Murphy*, 412 U.S. 291, 93 S.Ct. 2000 (1973)). Further, "[t]he justification or reason for the authority to search incident to a lawful arrest rests as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." *Id.* at 293 (citing *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467 (1973)).

Accordingly, Cpl. Innerarity had the right to stop Defendant, who he reasonably suspected had committed an offense, and demand his name, address, and an explanation of his actions. Defendant had been in the general area of the crime under investigation, and, in addition to wearing clothes matching that of the suspects, he matched their general physical description. Defendant ran upon seeing Cpl. Innerarity's patrol unit just as the suspects did when approached by Officer Frost. Finally, Defendant was uncooperative when questioned by Cpl. Innerarity and refused to fully identify himself despite repeated requests to do so.

The crime of "resisting an officer" is set forth in La.R.S. 14:108(A), as follows:

> Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.

As used in La.R.S. 14:108(A), "obstruction of" means, in addition to its common usage, the "[r]efusal by the arrested or detained party to give his name and make his identity known to the arresting or detaining officer or providing false information regarding the identity of such party to the officer." La.R.S. 14:108(B)(1)(c). Here, there can be little doubt based on the evidence that Defendant had reason to believe that Cpl. Innerarity was actually a police officer engaged in his official duties, as he was in uniform and was in a patrol unit.

11

Cpl. Innerarity's initial investigatory stop and questioning of Defendant was clearly lawful. "The officer, relying on his training and experience, reasonably suspected the defendant was a [suspect in the burglary/shooting under investigation]" and "was thus objectively justified in pursuing a means of investigation that would quickly confirm or dispel his suspicions." *State v. Turner*, 13-180, p. 2 (La. 3/1/13), 108 So.3d 753, 754 (per curiam). During the investigatory stop, probable cause to arrest Defendant for resisting an officer arose when he continuously refused to identify himself to Cpl. Innerarity after being given every opportunity to do so by him, another officer on the scene, and even bystanders who encouraged him to do so. Having probable cause to arrest Defendant based on the resisting offense, Cpl. Innerarity's search was justified even though it preceded the actual arrest. *State v. Lewis*, 12-902 (La.App. 5 Cir. 6/27/13), 121 So.3d 128, *writ denied sub nom. State ex rel. Lewis v. State*, 13-1926 (La. 4/17/14), 138 So.3d 618.

While Defendant was neither placed under arrest at the time of Cpl. Innerarity's search nor actually charged with that offense, it is not necessary that the arrest occur prior to the search so long as the law enforcement officer has probable cause to arrest. *Sherman*, 931 So.2d 286. "If an arrest is justified before the search, it is not unreasonable for the search to be made before instead of after the arrest." *Id.* at 292. It is further of no moment that the arresting offense was not the offense for which probable cause initially existed. The supreme court held that so long as there is probable cause to effectuate a custodial arrest, no constitutional rights are violated by a search incident to an arrest. *Id.* Additionally, it held, "Where the police have probable cause to effect a lawful custodial arrest, and conduct a search of that person incident to arrest, the fruits of that search may not be suppressed merely because the police did not intend to arrest the suspect for the offense for which probable cause existed." *Id* at 297.

12

We find no error in the judgment of the trial court denying Defendant's motion to suppress. Cpl. Innerarity had reasonable suspicion to stop Defendant, and he had probable cause to arrest Defendant for resisting an officer based on his refusal to identify himself. Thus, the search resulting in the seizure of the heroin was justified as a search incident to a lawful arrest. The fact that Cpl. Innerarity gave Defendant a break by only arresting him on the drug offense is of no consequence. Accordingly, we find no merit in this assignment.

*Assignment of Error Number Two*

Next, Defendant asserts that the trial court abused its discretion by preventing him from attacking Cpl. Innerarity's credibility during cross examination. He claims that because Cpl. Innerarity was the only witness to the possession, it was crucial that the jury consider his credibility in order to determine whether Defendant knowingly and intentionally possessed the drugs. Thus, Defendant argues that he was prevented from exercising his constitutional right to fully confront his accuser when the trial court sustained the State's objection, on prejudicial grounds, and excluded questions concerning whether Cpl. Innerarity planted the drugs on Defendant or had ever been disciplined.

In addressing this issue, we look to the actual colloquy pertaining to the question, the objection, and the trial court's ruling:

Q       Officer Innerarity, did you plant the drugs on Mr. Hargrove?

A       No, sir.

> MR. DOGGETT: Objection.
>
> THE COURT: Hold on, Mr. Innerarity. Grounds for objection?
>
> MR. DOGGETT: Prejudicial.

13

THE COURT: Sustained. Jury will not speculate nor take into consideration what the officer said to the answer to that question.

MR. STEPHENS: I'm sorry, Your Honor. I'd like to object for the record.

THE COURT: Objection is noted for the record.

MR. STEPHENS: Note my objection for the record.

THE COURT: It is noted.

MR. STEPHENS: And, also, Mr. Innerarity, were you ever disciplined –

MR. DOGGETT: Objection. Relevance.

THE COURT: Sustained. For Relevance.

Louisiana Code of Evidence Article 103(A)(2) provides that when the trial court ruling excludes evidence, an error may not be predicated upon the ruling "unless a substantial right of the party is affected," and "the substance of the evidence was made known to the court by counsel." In objecting to the exclusion of evidence, a defendant "must state the basis for his objection . . . and point out the specific error of the trial court." *State v. Legaux*, 19-75, p. 9 (La.App. 1 Cir. 9/27/19), 288 So.3d 791, 798. "The grounds for the objection must be sufficiently brought to the attention of the trial court to allow it the opportunity to make the proper ruling and correct any claim of prejudice." *Id.*

Here, Defendant provided no grounds for the trial court to consider when objecting to the ruling. Thus, the trial court was not given the opportunity to consider Defendant's constitutional confrontation right or the probative value of the evidence sought to be elicited, as Defendant now argues on appeal. Defendant's objection "for the record" without specifying the reasons therefore failed to properly preserve

14

the issue for review. *State v. Coleman*, 21-870, p. 11 (La.App. 1 Cir. 4/8/22), 342 So.3d 7, 15. Therefore, we will not address this assignment of error.

## DECREE

For the reasons set forth, Defendant's conviction and sentence for possession of a Schedule I controlled dangerous substance, heroin, between two and twenty-eight grams, in violation of La.R.S. 40:966(C)(4)(b), are affirmed.

**AFFIRMED.**